# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**ROUNDTREE GOODMAN,**

      **Plaintiff,**

**v.**                                  **Case No. 2:12-cv-00439**

**ROBIN RAMEY, Correctional Officer,**
**SHERRY COOK, Unit Manager,**
**VALORIE ADKINS, Case Manager,**
**DAVID BALLARD, Warden,**
**BRIAN GREENWOOD, Disciplinary Hearing Officer,**
**SHERRILL LYNN SNYDER, Mental Health Director,**
**JASON COLLINS, Associate Warden of Programs,**
**MARK CRAWFORD, Librarian,**
**CHERYL CHANDLER, Warden's Executive Assistance,**
**all at Mount Olive Correctional Complex,**
**JAMES RUBENSTEIN, Commissioner of Division of Corrections,**
**and JOHN AND JANE DOE, Unknown Defendants,**
**each sued in their individual capacities, unless**
**the court deems it proper and just to modify,**

      **Defendants.**

### PROPOSED FINDINGS AND RECOMMENDATION

On February 21, 2012, the plaintiff, Roundtree Goodman, filed a Complaint (ECF No. 2.) and an Application to Proceed Without Prepayment of Fees and Costs (ECF No. 1.)  This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

## STANDARD OF REVIEW

Pursuant to the provisions of 28 U.S.C. § 1915A, the court is obliged to screen each case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.  On review, the court must dismiss the case if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.  This screening is done prior to consideration of the Application to Proceed without Prepayment of Fees and Costs.  A "frivolous" case has been defined as one which is based on an indisputably meritless legal theory.  *Denton v. Hernandez*, 504 U.S. 25 (1992).  A "frivolous" claim lacks "an arguable basis either in law or in fact."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Pro se complaints are held to less stringent standards than those drafted by attorneys, and the court is obliged to construe liberally such complaints.  However, in *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."  While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Id.* at 555.

The Supreme Court elaborated on its holding in *Twombly* in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), a civil rights case.  The Court wrote:

> Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted).  Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id.*, at 556.
* * *

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

129 S. Ct. at 1949-50.

## THE PLAINTIFF'S ALLEGATIONS

The plaintiff in this civil action is a West Virginia Division of Corrections' prisoner serving a life without mercy sentence following his conviction for first degree murder.  The instant Complaint is an excessive 93 pages in length and contains a myriad of conclusory allegations.  Although the Complaint gives a detailed history of issues concerning the plaintiff's incarceration going back many years, a thorough review of the Complaint indicates that his claims in the Complaint arose out of conduct that occurred between February 25, 2010 and May 28, 2010, while the plaintiff was incarcerated at the Mount Olive Correctional Complex (MOCC) in Mount Olive, West Virginia.  On May 28, 2010, the plaintiff was transferred to the Northern Regional Jail and Correctional Facility (NRJCF), where he is currently incarcerated, and which is within the jurisdiction of the United States District Court for the Northern District of West Virginia.

The plaintiff has alleged claims concerning the denial of various constitutional rights. His claims appear to fall into six categories, as follows: (1) due process violations arising out of prison disciplinary hearings; (2) due process violations arising out of the plaintiff's placement and continued confinement in administrative segregation; (3) denial of access to the courts; (4) a violation of the plaintiff's First Amendment right to the free exercise of his religion; (5) retaliation claims; and (6) claims concerning the constitutionality of various prison rules.

The plaintiff's Complaint alleges and readily admits that, for years, the plaintiff had been developing information about certain Division of Corrections (DOC) employees and about prison conditions and practices, in order to file what the plaintiff refers to as a "habeas corpus petition." (ECF No. 2 at 26-27.) The plaintiff's Complaint alleges that, over a six-year period, he had acquired information on over 100 employees' backgrounds. (*Id.* at 27.) From what the undersigned can garner from the plaintiff's lengthy diatribe, the plaintiff was attempting to accomplish several things by gathering this information.

First, the plaintiff was attempting to demonstrate that Division of Corrections employees were held to a different standard of conduct than that of the inmates. For example, the plaintiff alleges that inmates who sought to be paroled to the home of a girlfriend or "common law wife" may be denied parole because the Parole Board would use the now-repealed West Virginia Code § 61-8-4 regarding "lewd and lascivious cohabitation and conduct" as a reason for denial of parole, while DOC employees may be living under similar circumstances. Second, the plaintiff alleges that he was attempting to gather information about whether certain DOC employees were qualified to hold their positions. Third, the plaintiff alleges that he was attempting to gather information

about prison practices to show some sort of corruption or collusion by DOC officials and possible criminal conduct of its employees.

In addition to gathering this information in anticipation of filing some sort of civil action in the future, the plaintiff's Complaint states that he had filed a habeas corpus petition in the Circuit Court of Fayette County on or about July 20, 2005. Counsel was appointed to represent the plaintiff in that action, and a hearing was held on or about April 13, 2007. This habeas corpus petition apparently involved a prior disciplinary violation by the plaintiff, which was ultimately expunged from his record, as well as other claims (such as the claim concerning the lewd and lascivious conduct statute); the court apparently found that there was insufficient evidence to support the other claims. (*Id.* at 27-28.) The undersigned, however, cannot tell from the face of the Complaint when this habeas corpus proceeding concluded.

<u>The plaintiff's "Trading and Selling" rule violation and placement in segregation</u>

On February 16, 2010, the plaintiff, who was then housed in MOCC's general population, received a money order from the parents of another inmate, Larry Potter. The plaintiff alleges that the Potters sent him the money order for being a "Christian brother" to their son. The plaintiff alleges that, despite being told by his unit team manager [unidentified] that it was not against the rules for him to accept the money order, and despite the money order being processed into the plaintiff's account, on or about February 25, 2010, the plaintiff and Larry Potter were both written up by defendant Robin Ramey for a violation of Policy Directive 1.23 for "Trading or Selling." (*Id.* at 28-30.) The plaintiff alleges that the violation report filed by defendant Ramey stated as follows:

5

On 18 February 2010 at approximately 0830 hours I Sgt. Robin Ramey was performing my duties as the intelligence officer at Mount Olive Correctional Complex while reviewing money orders, I found two money orders from an individual named Sherman G. Potter.  The two money orders were made out to inmate Larry Potter DOC 22814 and Roundtree Goodman DOC 11294.  According to IMS Sherman G. Potter is inmate Larry Potter's Father and approved visitor.  Due to the fact that inmate Goodman received money from another approved visitor, it places him in direct violation of Policy Directive 325.00 Section 1.23, Trading and selling with others.  Attached to the incident report is a copy of the money order and imis [sic; IMS] information.

(*Id.* at 30.)

As noted by the plaintiff, the "Trading or Selling" rule provides in pertinent part:

1.23 – Trading or Selling with others:  No inmate shall trade, sell, loan, give, borrow, *receive*, or offer for trade, sale, loan, *gift or receipt* any goods or services of any nature with employees, contracted employees, or any other persons who have dealings with the West Virginia Regional Jail and Correctional Facility Authority, the West Virginia Division of Corrections, *including visitors*, other than through the system established by the Warden/Administrator for that purpose.

(*Id.* at 32.)[Emphasis added]

On March 3, 2010, the plaintiff appeared at a disciplinary hearing before defendant Brian Greenwood, the Disciplinary Hearing Officer.  The plaintiff alleges that defendant Greenwood would not allow the plaintiff to call Sherman Potter, the gentleman who sent the money order, as a witness.  The plaintiff alleges that defendant Greenwood stated that he didn't know Mr. Potter's number.  However, the plaintiff further maintains that inmate Larry Potter was present as a witness for the hearing and could have provided Greenwood with his father's number.  The plaintiff was found guilty of the trading and selling violation and was given 60 days of punitive segregation and loss of privileges.  The plaintiff was not denied any good time credit for this violation.  (*Id.* at 32-33.)

6

The plaintiff states that he appealed the guilty finding, which was upheld by Warden David Ballard on March 15, 2010, and by Commissioner James Rubenstein on March 30, 2010.  (*Id.* at 34.)

The plaintiff alleges that he was taken directly from the disciplinary hearing to the Quilliams One Segregation Housing Unit and placed in a 72-hour lockdown.  (*Id.*)  The plaintiff further alleges that, between February 22, 2010, and March 16, 2010, while he was in segregation, he was not permitted to see a mental health therapist, which he claims violated an active court order that he be seen by a mental health therapist bi-weekly for thirty minutes.  (*Id.* at 35.)

The plaintiff further alleges that, on March 31, 2010, while the plaintiff was being housed in punitive segregation, the Administrative Segregation Committee, which consisted of defendants Sherrill Snyder and Cheryl Chandler and a third person, Regina Stephenson (who is not a defendant herein), held a 30-day segregation status review, without the plaintiff being present, and recommended that the plaintiff remain in segregation until his punitive segregation period was over.  This decision was allegedly upheld by Warden Ballard.  (*Id.* at 36.)   On April 15, 2010, the Administrative Segregation Committee met and again recommended that the plaintiff remain in punitive segregation.  (*Id.* at 37.)

### The reduction of the plaintiff's property

The plaintiff further alleges that, because he had been placed in segregation, on March 10, 2010, he was told that he had to reduce all of his property.  On March 12, 2010, the plaintiff alleges that he was taken to a multi-purpose room and directed to reduce his property down to two locker boxes during a one-hour time period.   The plaintiff states that he attempted to organize his records and discard any extra copies of

documents he already possessed.  (*Id.*)  On April 7, 2o10, the plaintiff communicated with the State Shop Supervisor about reducing his property and expressed his concern about the volume of documents he possessed.  The plaintiff requested that he be allowed to have the documents brought to him to sort through, so that he could have his attorney pick up his criminal files.  The plaintiff further alleges that he had two other active civil cases at that time, and again alleges that he was preparing to file a third, which involved all of the documents and records that he had been collecting for more than six years.  The plaintiff alleges that, when he was moved out of his cell, all of his organized records were mixed up.  (*Id.* at 37-39.)

On April 26, 2010, defendant Valorie Adkins and a counselor, Ryan Bostic (who is not a named defendant), took the plaintiff to a room to go through his records. Defendants Jason Collins and Sherry Cook were already in the room.  The plaintiff alleges that they had gone through his documents and found records pertaining to current and former MOCC employees.  These documents included defendant Sherry Cook's marriage license and her son's birth certificate.  The plaintiff states that he told the staff members those documents were part of his evidence he had collected for his habeas corpus petition concerning the lewd and lascivious conduct statute.  Defendant Collins allegedly told defendants Cook and Adkins to go through the plaintiff's papers and reduce them to one small locker box and to write up the plaintiff for "compromising an employee." (*Id.* at 40-44.)

Defendant Collins further allegedly threatened to paint the plaintiff as a "child stalker" and threatened to keep the plaintiff in administrative segregation and on the Quality of Life Program for as long as he could.  Defendants Cook and Adkins allegedly came to the plaintiff's cell later and yelled at him about having Cook's documents and

8

also threatened him.  The plaintiff claims that there were rumors that administrative officials at MOCC were threatening to kill him.  The plaintiff alleges that he started to keep a journal about these events.  (*Id.* at 44-45.)

On April 27, 2010, the plaintiff alleges that he was "stripped out" of his cell and taken to the shower.  During this time, defendant Adkins took all of the plaintiff's legal mail and other records, grievance documents, the journal he had been keeping, and his Bible from his segregation cell.  (*Id.* at 46.)  The plaintiff alleges that defendant Adkins repeatedly threatened him.  (*Id.* at 46-47.)

On April 28, 2010, the plaintiff alleges that defendant Adkins made him go through all of his records and throw out any papers for cases that were not active.  The plaintiff alleges that he was forced to throw out grievance documents and numerous other records that he had compiled in order to file a civil suit that he had intended to file in March of 2010, but which was delayed by his placement in segregation.  (*Id.* at 47.)

The plaintiff alleges that, on April 28, 2010, he also filled out a unit team request form asking for the return of his institutional rule book, his religious books, his grievances, the Correctional Manual, court decisions, a calendar, envelopes and stamps, and letters to his therapist, which were missing from his cell.  He claims that defendant Adkins refused to respond.  (*Id.* at 48.)

On April 29, 2010, the plaintiff was again taken to a room to go through his records.  The plaintiff alleges that, on that same day, he was taken to a telephone to communicate with his mental health counselor, and further alleges that someone was listening over the phone throughout the conversation.  Ultimately, the plaintiff's therapy session was cut short because he was told that he had to return to his cell for a

lockdown.  The plaintiff alleges that this was purposefully done to interfere with his treatment.  (*Id.* at 48-49.)

The plaintiff's "Fraudulent Representation" rule violation

The plaintiff further alleges that, during his telephone call with the mental health counselor, the plaintiff was presented with another disciplinary violation report for fraudulently representing that he had destroyed the Sherry Cook documents when he had not.  The plaintiff alleges that the violation report, which was filed by defendant Cook, stated as follows:

> On Monday 26 April 2010 I, Unit Manager Sherry Cook, was in Quilliams Two Unit at the Mount Olive Correctional Complex at approximately 1300 hours I was searching the personal property of inmate Roundtree Goodman when I found the following:  A copy of my son's Birth Certificate and a copy of my marriage license.  I spoke with Goodman at approximately 0900 HRS on this date about why he had required this information and where the certificates were now.  I/M Goodman assured me that he had destroyed all the documents in question.  Inmate Goodman is in violation of policy directive 325.00 Section 2.17 Fraudulent Representation.

(*Id.* at 49.)

The plaintiff's Complaint further alleges that he was scheduled to discharge his time in punitive segregation and return to the mainline population on April 30, 2010.  However, as the plaintiff was being escorted out of the segregation unit, he was given a detention slip for the fraudulent representation violation report filed by defendant Cook.  Thus, the plaintiff was returned to his segregation cell and was required to spend another 72 hours on lockdown.  (*Id.* at 51.)

The plaintiff's Complaint further alleges that, on April 30, 2010, in an attempt to prevent defendants Cook, Adkins and Crawford from destroying his legal documents and other property, he wrote a letter to Assistant Attorney General Charles Houdyschell,

10

addressing the destruction of his legal property and claiming retaliation, but received no response.  (*Id.* at 52.)  The plaintiff's Complaint further alleges that he filed a motion for a restraining order in the Circuit Court where he was convicted to stop the destruction of documents from his criminal file that were in his possession.  A hearing was held, at which Mr. Houdyschell appeared for the Warden, and the court ordered that the records in the possession of the plaintiff pertaining to his criminal case be turned over to his habeas counsel.  (*Id.* at 52-53.)

The plaintiff's "Contraband" rule violation

On May 6, 2010, the plaintiff received another violation report filed by defendant Adkins charging him with a violation of Policy Directive 325.00 Section 2.11 for "Contraband."  The plaintiff alleges that the violation report stated as follows:

> On Sunday 25 April 2010, I case manager Valorie Adkins was working my assigned post in Quilliams Two Unit at the Mount Olive Correctional Complex.  At approximately 1000 hours I was searching the personal property of inmate Roundtree Goodman # 11-294 when I found the following:  A copy of MOCC Post Order 3A-04, Shift Commander General Duties, dated 01 December 2003, and Signed b[y] Thomas L. McBride, Warden, a copy of MOCC post Order 3B-24 Information Systems & Communications (IS&C) Assistant General Duties and Responsibilities dated 16 October 2004 and signed by Thomas McBride, Warden.  One copy of Written Reprimand issued to Unit Manager William Kincaide on 16 June 1998.  Inmate Goodman is in violation of Policy Directive 325.00 Section 2.11 Contraband.  End of Report.

(*Id.* at 55.)

A disciplinary hearing was held on the plaintiff's write-ups for fraudulent misrepresentation and contraband on May 13, 2010.  The plaintiff moved for the recusal of Hearing Officer Brian Greenwood because he had been named as a defendant in the plaintiff's prior habeas corpus action, which was apparently still active.  Defendant Greenwood recused himself.  The plaintiff was ultimately found not guilty of the

11

contraband charge, but was found guilty of the fraudulent representation charge, and received 14 days of punitive segregation, but was given time served.  (*Id.* at 55-56.)

<u>The plaintiff's placement in administrative segregation and subsequent transfer</u>

The plaintiff alleges that he was set to be returned to the mainline population, but was given another detention slip by defendant Cook.  Although there were no other disciplinary violations pending at that time, the plaintiff alleges that the detention slip stated:  "Available information indicates that you are a [sic] dangerous to the safe and secure operation of the institutional facility."  Thus, the plaintiff was returned to segregation and was required to spend another 72 hours on lockdown.  (*Id.* at 57.)

On May 18, 2010, the plaintiff went before the Administrative Segregation Committee again.  The plaintiff alleges that he was told that he "needed to be kept in a more secure environment."  Thus, the Committee recommended that the plaintiff remain in Administrative Segregation and that he be required to complete the Quality of Life Program.  (*Id.* at 58.)  This decision was initially upheld by defendant Ballard.  (*Id.*)  However, subsequently, that decision was reversed by the following finding:

> Upon further review of the record of your 18 May 2010 Initial Administrative Segregation Hearing, and consideration of the circumstances which prompted that hearing, I have decided that it would be in your best interest for me to amend my decision.  Therefore, you will be transferred from Mount Olive Correctional Complex as soon as possible and will be released from Administrative Segregation at that time.  As before, you have the right to appeal this decision to the Commissioner if you so choose.  The Appeal must be filed in writing within five days.

(*Id.* at 58-59.)  The plaintiff was transferred to the Northern Regional Jail and Correctional Facility on May 28, 2010.  (*Id.* at 59.)

The undersigned intends to address the plaintiff's claims categorically, based upon subject matter. However, the undersigned also believes it will be helpful to set forth a summary of the allegedly unconstitutional conduct of each defendant.

### Robin Ramey

The plaintiff alleges that defendant Robin Ramey filed a disciplinary violation report against the plaintiff concerning "Trading or Selling" that was vague and ambiguous on its face. The plaintiff further claims that this write-up violated his First, Fifth and Fourteenth Amendment rights. The plaintiff also claims that defendant Ramey violated his due process and equal protection rights under the Fourteenth Amendment when she processed the money order and placed the money in the plaintiff's account before filing the disciplinary violation report. The plaintiff also claims that defendant Ramey violated his First Amendment right to free exercise of his religion because the money order was sent to the plaintiff as a thank you gift for being a "Christian brother" to inmate Larry Potter. The plaintiff claims that this conduct has caused him mental distress and the potential to harm himself.

### Sherry Cook

The plaintiff alleges that, on April 26, 2010, defendant Sherry Cook filed a false disciplinary report for "False Representation" against him in retaliation for obtaining her personal information. The plaintiff further alleges that, on April 30, 2010, defendant Cook retaliated against the plaintiff by filing a detention slip against him based upon the April 26, 2010 disciplinary violation report. The plaintiff alleges that this resulted in his unconstitutional confinement in segregation. The plaintiff further alleges that, after being found guilty of the fraudulent representation charge and having been given time served in segregation, defendant Cook had another detention slip filed

13

against the plaintiff on May 13, 2010, to hold him in segregation in continued retaliation for obtaining information about her and her family.

Valorie Adkins

The plaintiff alleges that defendant Valorie Adkins went through the plaintiff's records and then filed a false disciplinary report against the plaintiff for having "Contraband" in retaliation for gathering information about MOCC staff and policies. The plaintiff further alleges that the contraband charge was dismissed.  The plaintiff further claims that defendant Adkins violated his right of access to the courts by taking it upon herself to determine which documents the plaintiff could keep for active cases and which documents were to be destroyed.  The plaintiff further alleges that defendant Adkins violated his right of access to the courts by destroying his 50-page complaint that was to be filed in federal court, as well as his grievance documents and his journal.

David Ballard

The plaintiff alleges that defendant David Ballard had actual knowledge about the money order issue because the Potter family contacted his office, and that defendant Ballard still took no action to overturn the charges.  The plaintiff further alleges that defendant Ballard became aware that his employees were destroying the plaintiff's documents during a hearing in the Circuit Court of Boone County on May 12, 2010.  The plaintiff alleges that defendant Ballard denied the plaintiff's due process rights because he placed the plaintiff in an atypical and significant hardship when he failed to correct the destruction of the plaintiff's property, which resulted in the permanent loss of evidence to support the plaintiff's claims.  The plaintiff also alleges that defendant Ballard denied the plaintiff's First Amendment rights concerning the money order issue, since the money order was given to him for a religious purpose.

14

Brian Greenwood

The plaintiff alleges that defendant Brian Greenwood violated the plaintiff's right to a full and fair disciplinary hearing concerning the "Trading or Selling" charge because he would not allow the plaintiff to call Larry Potter's father as a witness.

Sherrill Lynn Snyder

The plaintiff alleges that defendant Sherrill Lynn Snyder violated the plaintiff's right to due process because the plaintiff was denied the right to be present at administrative segregation committee review meetings/hearings on March 31, 2010, April 15, 2010, and May 18, 2010, where it was determined that the plaintiff would be held in administrative segregation.  Thus, the plaintiff claims that he was denied a full and fair hearing.  The plaintiff further alleges that the decision to hold him in administrative segregation and to require him to complete the Quality of Life Program was made based upon the fact that the plaintiff had acquired information about MOCC staff.  The plaintiff also alleges that the loss of his property resulted from the decision to hold him in segregation for more than 30 days.

Jason Collins

The plaintiff alleges that defendant Jason Collins retaliated against the plaintiff because the plaintiff had obtained information about MOCC staff.  The plaintiff further alleges that defendant Collins threatened his life and ordered the destruction of his documents, which denied him access to the courts.  The plaintiff further alleges that defendant Collins violated both state and federal law and prison policies by not releasing the plaintiff from segregation after the 60-day period he received as a result of the "Trading or Selling" charge.  The plaintiff claims that this resulted in an atypical and significant hardship to the plaintiff and took a mental toll on him.

### Mark Crawford

The plaintiff claims that defendant Mark Crawford, MOCC's librarian, stole records that the plaintiff had obtained about him. Thus, the plaintiff alleges that defendant Crawford denied him access to the courts.[1]

### Cheryl Chandler

The plaintiff alleges that defendant Cheryl Chandler, the administrative assistant to Warden Ballard, had actual knowledge of the money order issue because the Potters contacted the Warden's Office on February 20, 2010 to explain why they had sent the money order, yet defendant Chandler failed to take any action to correct the matter. The plaintiff claims that this conduct violated his First Amendment rights. The plaintiff also claims that defendant Chandler, who sits on the Administrative Segregation Committee, violated his right to due process by denying him a full and fair hearing each time they had a review meeting. The plaintiff also alleges that defendant Chandler failed to take any action to prevent the destruction of the plaintiff's legal files.

### James Rubenstein

The plaintiff alleges that defendant James Rubenstein failed to take any corrective action concerning the plaintiff's appeals of his disciplinary violations. The plaintiff further alleges that various DOC policy directives concerning rule violations, over which defendant Rubenstein has decision-making authority, are vague and ambiguous and should be struck down as unconstitutional.

---

[1] The plaintiff also claims that defendant Crawford terminated the plaintiff's employment as a law library aide in 2009. However, whatever claims the plaintiff may wish to assert as a result of this conduct are barred by the two-year statute of limitations, as discussed *infra*.

The plaintiff seeks the following relief on his claims:

- An order declaring each referenced section of Policy Directive 325.00 to be unconstitutional and ordering the removal of each;

- An order to expunge any of the plaintiff's previous disciplinary violations reports of which he was found guilty under Policy Directive 325.00;

- $10,000 in damages from each defendant who took part in reading and seizing the plaintiff's legal papers;

- An order to return any of the plaintiff's documents seized by defendants Adkins, Cook, Crawford, or John/Jane Doe, in their original condition, undamaged or, in the alternative, $100 in damages from each named defendant for each document seized or lost;

- $5,000 in damages from defendants Greenwood, Ballard, Chandler and Snyder;

- An order for the return of any property the plaintiff's attorney may have, including his word processor and diskettes to recover his destroyed records;

- Judgment in favor of the plaintiff against each of the named defendants, jointly and severally, for all costs incurred in this action;

- An order placing the defendants on notice that any type of reprisal or retaliatory action by the defendants, their agents or friends will cost them $8,000 per act;

- Any other relied deemed just and proper by the court.

(ECF No. 2 at 92-93.)

## ANALYSIS

**A.      Some of the plaintiff's allegations are barred by the applicable statute of limitations.**

While it appears that the plaintiff has provided a great deal of the information and allegations in his Complaint for background purposes, the undersigned wishes to make it clear that, because the plaintiff filed the instant Complaint on February 21, 2012, only allegations concerning conduct that occurred on or after February 21, 2010 may be actionable under 42 U.S.C. § 1983.  It is well-established that civil rights cases filed in federal court follow the analogous state limitation.  *Blanck v. McKeen*, 707 F.2d 817 (4th Cir. 1983).  West Virginia has a two-year statute of limitations for cases similar to section 1983 cases and other personal injuries.  W. Va. Code § 55-2-12(b)(1981); *see McCausland v. Mason County Bd. of Educ.*, 649 F.2d 278 (4th Cir. 1981; *Rodgers v. Corporation of Harpers Ferry*, 371 S.E.2d 358 (W. Va. 1988).

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that any claims arising out of allegations concerning conduct that occurred prior to February 21, 2010 are barred by the applicable two-year statute of limitations.

**B.      The plaintiff's Complaint fails to state a claim upon which relief can be granted concerning his disciplinary hearings and his placement in segregation.**

The plaintiff alleges that his institutional disciplinary proceedings violated his right to due process of law because the violations reports were based upon false evidence and were based upon vague and ambiguous rules.  The plaintiff also claims that his due process rights were violated because the plaintiff was not permitted to call a witness at one of his disciplinary hearings.   The plaintiff further alleges that his write-ups were timed in a way to prohibit him from discharging from segregation in retaliation for

18

developing the evidence about various MOCC employees.  The plaintiff also appears to be arguing that decisions made by the Administrative Segregation Committee to house him in administrative segregation violated his due process rights.

The relief the plaintiff seeks for these alleged constitutional violations is the "expungement" of the violations reports from his institutional record and the imposition of money damages against the defendants who were involved in the disciplinary process and the appeals thereof, and the decisions to place the plaintiff in administrative segregation.

The undersigned first notes that the plaintiff did not lose any good time credit as a result of any of these alleged disciplinary violations.  In *Edwards v. Balisok*, 520 U.S. 641, 646 (1997), the Supreme Court held that, in the context of prison disciplinary proceedings which result in the loss of good-time credits, challenges to prison hearing procedures which necessarily imply the invalidity of the judgment must be pursued in habeas corpus.  Thus, a challenge to the <u>validity</u> of a prison disciplinary hearing based on alleged due process violations is simply not cognizable under 42 U.S.C. § 1983.  *Id.* at 649.  Therefore, the plaintiff's due process challenges seeking the expungement of his prison disciplinary decisions are not cognizable.

Here, since the plaintiff did not lose good time credits, his challenge is not based on a change in the duration of his sentence, as governed by *Edwards* but, rather, it is based on a change in his security classification.  Thus, the overriding question before this court is whether the plaintiff has a liberty interest, protected by the Due Process Clause, in not being classified in segregation.  If he has no protected liberty interest, the due process violations he alleges are not actionable.  *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997).

Prisoners do not have an independent constitutionally recognized liberty interest in their security classification or placement.  *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (*receded from in Sandin v. Conner*, 515 U.S. 472 (1995); *Trujillo v. Williams*, 465 F.3d 1210 (10th Cir. 2006).  However, the Supreme Court, in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995), recognized that

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause.   [Citation omitted.] But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Claus of its own force, [citations omitted], nonetheless *imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life*.  [Emphasis added.]

The Court noted that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  *Id.* at 485 (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).

> We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.  The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. * * * Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. * * * Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.

*Id.* at 486.  The Court rejected the position that any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation.  *Id.* at 484.

Thus, an inmate who alleges that his right to due process of law was denied in connection with a reclassification of his custody status to administrative segregation

must show that he had a protected liberty interest in his prior non-administrative segregation status because (1) administrative segregation imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life, or (2) that administrative segregation exceeds similar, but totally discretionary, confinement in either duration or degree of restriction, or (3) that administrative segregation worked a major disruption in his environment.  Because the plaintiff cannot demonstrate the loss of a liberty interest through the loss of good time credit, he has attempted to establish a due process right based upon his assertions that his placement in administrative segregation resulted in an atypical and significant hardship to him.

The authority addressing the constitutional implications of long-term administrative segregation since *Sandin* is varied.  In *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997), the Fourth Circuit, applying *Sandin*, established that:

> In order to determine whether the inmates possessed a liberty interest, we must compare the conditions to which they were exposed in administrative segregation with those they would expect to experience as an ordinary incident of prison life.  [Citation omitted.]  This analysis necessarily is fact specific in that it requires a determination of the conditions the prisoner maintains give rise to a liberty interest and those incident to normal prison life.

*Beverati* further notes, however, that whether the conditions impose an atypical and significant hardship creating a liberty interest is a question of law.  *Id.*

In the decision of *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464 (4th Cir. 1999) (hereinafter *Five Percenters*), the Fourth Circuit addressed the long-term segregation of prisoners who were members of a purported religious group that was classified as a security threat. *Five Percenters* found that the fact that the inmates were confined to their cells for twenty-three hours per day without radio or television, that they receive only five hours

of exercise per week, and that they may not participate in prison work, school or study programs, though highly restrictive, was not unconstitutional. Moreover, the Court found the indefinite duration of the inmates' segregation is simply one of many factors to consider in determining the constitutionality of long-term segregation. 174 F.3d at 471-72.

The Supreme Court again addressed this issue in *Wilkinson v. Austin*, 545 U.S. 209 (2005). There, the Court found that the restrictive conditions in the Ohio State Penitentiary, a "supermax" facility[2], did create an atypical and significant hardship within the correctional context, thus giving rise to a liberty interest in avoiding confinement therein. 545 U.S. at 223-224. The Court further found, however, that the Ohio Department of Corrections' policy concerning placement and continued confinement at the supermax facility provided a sufficient level of process to satisfy due process requirements. *Id.* at 225. The conditions discussed in *Wilkinson* are these: almost all human contact is prohibited, including cell-to-cell conversation, cell lights may be dimmed, but remain on for twenty-four hours, and the inmates are limited to one hour of exercise per day in a small indoor room. *Id.* at 210-211. Furthermore, placement in the Ohio supermax may be for an indefinite period with an initial 30-day assessment, followed by an annual review. *Id.* at 211. The *Wilkinson* Court stated that, "while any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context" which triggered a protected liberty interest in avoiding placement in the "supermax." *Id.* at 224.

---

[2] As noted in *Wilkinson*, "'Supermax' prisons are maximum-security facilities with highly-restrictive conditions, designed to segregate the most dangerous prisoners from the general population. Their use has increased in recent years, in part as a response to the rise of prison gangs and prison violence." 545 U.S. at 209.

Nationwide, decisions since *Wilkinson* have been split as to whether a liberty interest exists in avoiding placement in administrative segregation, based largely on each court's analysis of the specific facts of the cases before them.   As one court previously noted, "[t]here is no single standard for determining whether a prison hardship is atypical and significant, and the 'condition or combination of conditions or factors . . . requires case by case, fact by fact consideration.'" *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir.2003) (citation omitted).   Recently, within the Fourth Circuit, the United States District Court for the District of Maryland, in granting summary judgment to the defendants, found that the conditions of administrative segregation at the Maryland facility where the plaintiff was incarcerated did <u>not</u> create an atypical and significant hardship, although the same court had found that confinement at Maryland's "supermax" facility had implicated due process protections.   *Stedman v.* White, 2011 WL 2746730 *6 (D. Md., July 11, 2011).

The plaintiff has implied that administrative segregation at MOCC imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life by alleging that, during his time in administrative segregation, he was denied the ability to access the courts because some of his legal documents were destroyed.   He further claims that his continued confinement in segregation has limited his ability to receive mental health treatment and has resulted in extreme mental distress, including suicidal thoughts.   The plaintiff has also complained that, while in administrative segregation, he was placed in the Quality of Life program, which the plaintiff alleges "has the same punishment, treatment as those who are on Segregation for Rule Violations."   (ECF No. 2 at 72.)   The undersigned notes, however, that shortly after the decision to hold the plaintiff in administrative segregation, he was transferred to the

NRJCF.  Thus, the duration in which he was in administrative segregation and required to participate in the Quality of Life program was brief.

　　　To the extent that the plaintiff is claiming that he has suffered mental distress as a result of the defendants' decision to continue housing him in segregation, 42 U.S.C. § 1997e(e) provides that a claim for mental or emotional injury cannot be brought without a prior showing of physical injury.  Thus, the plaintiff cannot rely upon an abstract claim of mental or emotional injury to support his claim of an atypical or significant hardship sufficient to establish a liberty interest for a due process claim under section 1983.

　　　Furthermore, the plaintiff was transferred to the NRJCF on May 28, 2010.  Thus, any claim he is attempting to make for declaratory or injunctive relief related to his confinement in administrative segregation or his placement in the Quality of Life program at MOCC became moot at that time.  *See Williams v. Griffin*, 952 F.2d 820, 825 (4th Cir. 1991); *Ross v. Reed*, 719 F.2d 689, 692 (4th Cir. 1983).  The power of the federal courts to adjudicate claims turns on the existence of a case or controversy.  U.S. Const., art. III, § 2; *Daimler-Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  "When a case or controversy ceases to exist because the issue is no longer live or a party 'lack[s] a legally cognizable interest in the outcome[,]' preventing the court from granting effective relief, the claim becomes moot, and the court lacks the constitutional authority to adjudicate the issue."  *Taylor v. Riverside Regional Jail Authority*, 2011 WL 6024499 *4 (E.D. Va., Dec. 2, 2011) (citing *Powell v. McCormack*, 395 U.S. 486, 496 (1969) and *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

　　　As noted in *Taylor*, well-established Fourth Circuit precedent has recognized that "the transfer or release of an inmate from the facility where he suffered the challenged conditions 'moots his claims for injunctive and declaratory relief' pertaining to his

24

imprisonment." 2011 WL 6024499 at *4; *see also Rendellman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("as a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there.")

To the extent that the plaintiff has asserted that the conduct of the defendants caused him to be forced to be transferred to the NRJCF, there is no constitutional right to be housed in any particular correctional facility. *See Meachum v. Fano,* 427 U.S. 215 (1976) *and Montanye v. Haymes,* 427 U.S. 236 (1976), and, in general, a prison transfer does not implicate a liberty interest protected by the Due Process Clause. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983).

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Complaint, liberally construed, does not contain "enough facts to state a claim to relief that is plausible on its face." The plaintiff's due process claims have not alleged more than legal conclusions couched as factual allegations and factual allegations that do not support cognizable claims. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that, based upon the allegations concerning the plaintiff's disciplinary hearings and his placement in punitive and administrative segregation while at MOCC, the plaintiff's Complaint fails to state a claim upon which relief can be granted, and should be dismissed pursuant to *Twombly* and *Iqbal*.

### C.   The plaintiff's Complaint fails to state a claim concerning the denial of his right to access the courts.

The plaintiff's Complaint further alleges that defendants Adkins, Collins and Crawford violated the plaintiff's right of access to the courts because they participated in the destruction of the plaintiff's documents and records to support his 50-page civil suit

that had yet to be filed in federal court, and made the decisions concerning what documents the plaintiff could keep when he went into segregation. The plaintiff specifically alleges that defendant Adkins made the decision concerning which of the plaintiff's cases were active and which were not, and what documents were necessary to support those cases, and further specifically alleges that defendant Adkins destroyed his 50-page Complaint that he was preparing to file in federal court. The plaintiff further alleges that defendant Collins was the person who ordered that the plaintiff's documents and property be destroyed. The plaintiff further alleges that defendant Crawford stole the documents that the plaintiff had obtained about him.

The Supreme Court addressed inmates' right of access to the courts in *Lewis v. Casey*, 518 U.S. 343 (1996). In that case, the Supreme Court reviewed its decision in *Bounds v. Smith*, 430 U.S. 817 (1977), as follows:

> The right that *Bounds* acknowledged was the (already well-established) right of access to the courts. In the cases to which *Bounds* traced its roots, we had protected that right by prohibiting State prison officials from actively interfering with inmates' attempts to prepare legal documents, or file them, and by requiring state courts to waive filing fees, or transcript fees for indigent inmates. * * * In other words, prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. * * * Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.

*Lewis*, 518 U.S. at 350. [Citations omitted.] Having established the requirement that an inmate show "actual injury," the *Lewis* majority opinion then limited the cases in which "actual injury" must be shown.

> In other words, *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it

26

requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Id.* at 355.

The Rules of Civil Procedure in both federal and state court require a plaintiff to make a short and plain statement of his claims for relief; he is not required to produce evidence in support of every single claim at the time the suit is filed.  Specifically, Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  However, to avoid dismissal for failure to state a claim, a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Id.*

Assuming that the plaintiff's contemplated civil suit would state a claim upon which relief could be granted by either a federal or state court, destruction of evidence might lead to a claim of spoliation of evidence somewhere down the line, but that is not a matter of concern for this court as it pertains to the plaintiff's instant claim of denial of access to the courts.  The simple fact is, the plaintiff was not prohibited by the defendants from preparing or filing a short and plain statement of his contemplated claims for relief and, thus, was not denied access to the courts.  The plaintiff can show no actual injury.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Complaint fails to state a claim upon which relief can be granted with regard to the denial of access to the courts, and that the plaintiff's proposed claims

concerning the denial of access to the courts should be dismissed pursuant to *Twombly* and *Iqbal*.

> **D.** **The plaintiff's Complaint fails to state a claim concerning the denial of the right to free exercise of religion under the First Amendment.**

The plaintiff has also alleged that defendants Ramey, Ballard, Snyder and Chandler have denied him his right to the free exercise of his religion under the First Amendment because he received a rule violation report for accepting a money order from the parents of another inmate, which he claims was a "Christian gift." Specifically, the plaintiff alleges that, on February 16, 2010, Mr. and Mrs. Sherman Potter, the parents of MOCC inmate Larry Potter, sent the plaintiff a money order "as a token of their appreciation to the plaintiff for being a Christian brother to their son." (ECF No. 2 at 28.) The plaintiff further alleges that he did not know in advance that the Potters, with whom he had spent time when they were visiting their son, were sending him any money. (*Id.* at 29.)

The plaintiff further alleges that, despite being told by his unit manager [unidentified in the Complaint] that he or she knew of no rule prohibiting the plaintiff from receiving the money order, he was written up for a violation of Policy Directive 1.23, "Trading or Selling" by defendant Ramey. According to the Complaint, the violation report issued by Ramey stated as follows:

> On 18 February 2010 at approximately 0830 hours I Sgt. Robin Raney was performing my duties as the intelligence officer at Mount Olive Correctional Complex[.] [W]hile reviewing money orders, I found two money orders from an individual named Sherman G. Potter. The two money orders were made out to inmate Larry Potter DOC 22814 and Roundtree Goodman DOC 11294. According to IMS Sherman G. Potter is inmate Larry Potter['s] Father and approved visitor. Due to the fact that inmate Goodman received money from another approved visitor, it places him in direct violation of Policy Directive 325.00 Section 1.23, Trading and

28

selling with others.  Attached to the incident report is a copy of the money order and imis [sic; IMS] information.

(ECF No. 2 at 30.)  As noted by the plaintiff, the "Trading or Selling" rule provides in pertinent part:

> 1.23 – Trading or Selling with others:  No inmate shall trade, sell, loan, give, borrow, receive, or offer for trade, sale, loan, *gift or receipt* any goods or services of any nature with employees, contracted employees, or any other persons who have dealings with the West Virginia Regional Jail and Correctional Facility Authority, the West Virginia Division of Corrections, *including visitors*, other than through the system established by the Warden/Administrator for that purpose.

(ECF No. 2 at 32.)[Emphasis added]

The plaintiff further alleges that inmate Potter told the plaintiff that his parents contacted the Warden's office and spoke with defendant Chandler and that "they were taking care of it."  (*Id.* at 30.)  The plaintiff further alleges that, despite knowing that the money order was a "Christian gift," defendant Ballard did nothing to stop the disciplinary proceedings against the plaintiff concerning this issue and further upheld the discipline.  (*Id.* at 68-69.)  The plaintiff further alleges that defendants Snyder and Chandler, as members of the Administrative Segregation Committee chose to keep the plaintiff on segregation beyond 30 days, despite knowing that the money order had been a "Christian gift."  (*Id.* at 73, 77.)  The plaintiff further alleges that defendant Chandler did not prevent the write up, after having direct communications with the Potters about the money order.  (*Id.* at 77.)

Under the Free Exercise Clause of the First Amendment to the United States Constitution, made applicable to the states under the Fourteenth Amendment, a prisoner's right to practice his or her religion may only be restricted upon the showing that such restriction is reasonably related to a legitimate penological interest.  *See*

*O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987); *Turner v. Safley*, 482 U.S. 78, 84 (1987).  "This approach ensures the ability of corrections officers 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration' [citation omitted] and avoids unnecessary intrusion of the judiciary into problems particularly ill-suited to 'resolution by decree.'"  *O'Lone*, 482 at 349-350 (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).  Thus, federal courts are counseled to exercise judicial restraint in matters of prison administration.  *Turner*, 482 U.S. at 89.  A First Amendment claim turns on the reasonableness of the restriction, and allows the court to consider whether there are ready alternatives to accommodate the prisoner's religious rights.  *Id.* at 90-91.

The plaintiff has not alleged any actual restriction of his right to practice his religion.  The receipt of a gift from another inmate's family, which appears to be prohibited under a reasonable institutional rule designed for security measures, is not an exercise of religion or religious beliefs.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Complaint fails to state a claim upon which relief can be granted under the First Amendment, and that the plaintiff's proposed claims concerning the denial of his right to the free exercise of his religion should be dismissed pursuant to *Twombly* and *Iqbal*.

### E.      The plaintiff's retaliation claims are legally frivolous.

The plaintiff's Complaint further alleges that defendants Cook, Snyder and Collins retaliated against the plaintiff because he had obtained documents about them and other MOCC employees.  Specifically, the plaintiff alleges that defendant Cook filed a false disciplinary report against the plaintiff because he had obtained documents

about her and her son, and continued to file detention slips against the plaintiff in order to keep him in segregation.  (ECF No. 2 at 63-66.)

The plaintiff further alleges that defendant Snyder retaliated against the plaintiff after he sought public records about her by filing a disciplinary report against the plaintiff [which occurred outside the applicable statute of limitations] and then using her position on the Administrative Segregation Committee to keep the plaintiff in segregation.  (*Id.* at 71-73.)

The plaintiff further alleges that defendant Collins threatened the plaintiff, ordered the destruction of the plaintiff's documents, directed other employees to file disciplinary reports against the plaintiff, and took actions to ensure that the plaintiff continued to be held in segregation.  (*Id.* at 73-75.)

A plaintiff suing under section 1983 must establish three elements in order to prove a retaliation claim.  First, the plaintiff must demonstrate that he was exercising a constitutional right.  *See Huang v. Board of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1990).  Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutional right.  *See ACLU v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993) (stating that "a showing of adversity is essential to any retaliation claim").  Third, the plaintiff must demonstrate that a causal relationship exists between the exercise of the right and the defendant's retaliatory action.  *See Huang*, 902 F.2d at 1140.

> [C]laims of retaliatory actions are legally frivolous unless the complaint implicates some right that exists under the Constitution.  That is, [a] plaintiff[] must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right.  A claim of retaliation that fails to implicate any constitutional right "lacks even an arguable basis in law," [*Neitzke v.*

> *Williams*, 490 U.S. 319,] 328 [(1989)], and is properly subject to dismissal
> under § 1915(d).

*Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).  Thus, for an inmate to state a colorable claim of retaliation, the alleged retaliatory action must have been taken with regard to the exercise of some constitutionally protected right, or the retaliatory action itself must violate such a right.  *Adams*, 40 F.3d at 75.  The plaintiff must allege specific facts supporting the claim of retaliation; bare assertions of retaliation do not establish a claim of constitutional dimensions.  *Adams*, 40 F.3d at 74-75.

To the extent that the plaintiff is in any way claiming that the alleged retaliatory conduct was done because he had engaged in the grievance process, *Adams* forecloses such a claim, as it established that there is no constitutional right to participate in grievance proceedings.  40 F.3d at 75.

The plaintiff's retaliation claims are grounded in his assertion that he has a right to probe the private lives of prison staff and then file an "expose" complaint.  He has no such constitutionally protected right.

The plaintiff has also alleged that some of the retaliatory conduct involved threats and verbal abuse by the defendants and other prison staff.  As a general rule, verbal abuse of inmates by prison staff, without more, does not state a constitutional claim.  The plaintiff has not alleged a "serious or significant physical or emotional injury."  *See Strickler v. Waters*, 989 F.2d 1375 (4th Cir. 1993).  In fact, the plaintiff has only alleged an injury that is emotional in nature, which is insufficient to establish a cognizable claim.  *See Morrison v. Martin*, 755 F. Supp. 683, 687 (E.D.N.C. 1990).

The plaintiff has failed to establish that any of the alleged retaliatory conduct of the defendants has implicated a cognizable constitutional right.  Accordingly, the

undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to state any claim upon which relief can be granted, and that the plaintiff's proposed retaliation claims should be dismissed pursuant to *Twombly* and *Iqbal*.

### F.   The plaintiff's claims concerning the constitutionality of the rules contained in Policy Directive 325.00 lack merit.

The last section of the plaintiff's Complaint challenges the constitutionality of various sections of the West Virginia Division of Corrections' Policy Directive 325.00, which define prohibited conduct that may result in a disciplinary write-up for the violation thereof.  The sections challenged by the plaintiff include the three sections implicated by the three write-ups the plaintiff received during the time period that is actionable in his Complaint, as well as a number of other sections, which the plaintiff may have been written up for in the past, or which the plaintiff speculates could be easily violated by any inmate because they are vague and ambiguous.  The plaintiff seeks a declaratory judgment that each of the enumerated sections is unconstitutionally vague and ambiguous and an order directing that they be removed from Policy Directive 325.00.

The plaintiff alleges that defendant James Rubenstein, as the Commissioner of the Division of Corrections is charged with the duty to promulgate rules for all state correctional facilities.  Thus, the plaintiff alleges that Commissioner Rubenstein authorized Policy Directive 325.00, developed unconstitutional policies and procedures, and has allowed the use of these unconstitutional procedures to continue without correction.  (ECF No. 2 at 79.)

Due process "requires certain minimal standards of specificity in prison regulations."  *See Meyers v. Alldredge*, 492 F.2d 296, 310 (3d Cir. 1974).  Thus,

subjecting an inmate to discipline based upon a vague and ambiguous regulation violates the inmate's right to due process.  However, "it is nearly impossible for prison authorities to anticipate, through a narrowly drawn regulation, every conceivable form of misconduct which threatens prison security."  *Id.*  Therefore, a prison regulation will not be considered vague and ambiguous if it is "sufficient to apprise any inmate of ordinary intelligence" that his conduct would violate the particular regulation.  *Gaston v. Taylor*, 946 F.2d 340, 342 (4th Cir. 1991).

The plaintiff may only state a claim over which there is a case or controversy.  U.S. Const., art. III, § 2; *Daimler-Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Thus, the plaintiff must be able to show that he, himself, sustained the deprivation of a right, privilege or immunity secured by the Constitution or federal law.  *Inmates v. Owens*, 561 F.2d 560, 562-63 (4th Cir. 1977).  The plaintiff must be able to demonstrate standing to bring a claim by establishing a personal injury fairly traceable to the defendants' allegedly unlawful conduct that is likely to be addressed by the requested relief.  *Allen v. Wright,* 468 U.S. 737, 751 (1984).  Therefore, the plaintiff has no standing to assert claims concerning the constitutionality of any regulations which he has not been found guilty of violating.  Such claims would be entirely speculative and cannot survive scrutiny under *Twombly* and *Iqbal.*

Furthermore, because of the two-year statute of limitations, the plaintiff is limited to challenging the regulations or rules that he was charged with violating between February 25, 2010 and his transfer to the NRJCF on May 28, 2010.  Thus, the undersigned will undertake a review of sections 1.23, "Trading or Selling," and 2.17, "Fraudulent Representation," of Policy Directive 325.00 because these are the sections governing the rules violations of which the plaintiff was found guilty.  The plaintiff was

found not guilty of the "Contraband" charge under section 2.11, so he can show no injury based on that section.

As previously noted, the plaintiff has alleged that the "Trading or Selling" rule provides in pertinent part:

> 1.23 – Trading or Selling with others:  No inmate shall trade, sell, loan, give, borrow, *receive*, or offer for trade, sale, loan, *gift or receipt* any goods or services of any nature with employees, contracted employees, or any other persons who have dealings with the West Virginia Regional Jail and Correctional Facility Authority, the West Virginia Division of Corrections, *including visitors*, other than through the system established by the Warden/Administrator for that purpose.

(ECF No. 2 at 32.) [Emphasis added].

The plaintiff asserts that, in his situation, "there was no trading or selling involved in receiving a Christian gift."  (ECF No. 2 at 80.)  The plaintiff further asserts that "there is no way a family visitor can be considered as having dealings with the Division of Corrections.  This was clearly ment [sic; meant] for those [who] were visiting the facilities such as church visitors each week to either preach, or sing or some school or church program."  (*Id.*)  The plaintiff further asserts that the rules he is challenging contain "ambiguities that are so vague and outright nonsensical on their face that much interpretive power is investibly [sic; inevitably?] rests with the institutional Disciplinary Hearing Office, who is or was imparcial [sic; partial] against an inmate."  (*Id.*)

The "Trading or Selling" rule was designed to combat the practice of inmates exchanging goods or services with other inmates, employees, third-party vendors, and even inmate's visitors or other third parties - conduct which could lead to breaches of security at the prison.  The receipt of the money order from the Potter family was the type of conduct that was envisioned by this regulation, as is clearly dictated by the terms "receive," "gift or receipt" and "with any other persons . . . including visitors . . . ," and

the plaintiff cannot establish that an inmate of normal intelligence could not reasonably determine that such conduct would violate the regulation.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the "Trading or Selling" regulation is not unconstitutionally vague or ambiguous and, thus, the plaintiff's Complaint fails to state a claim upon which relief can be granted with regard to this regulation.

Turning to the language of the regulation governing "Fraudulent Representation," found in section 2.17, the plaintiff's Complaint alleges that the regulation states as follows:

> 2.17 – Fraudulent Representation:   No inmate shall represent himself/herself to any individual either as being a person other than who they are or incorrectly act as a representative of any corporation, association, or organization.  *No inmate shall deceive, attempt to deceive, misinform, or attempt to misinform any fact or information to any person.*  No inmate shall attempt to tender a worthless voucher.

(ECF No. 2 at 88.) [Emphasis added]  The plaintiff's Complaint further states:

> Plaintiff asserts this rule is abuse [sic; abused or used?] to retaliate against him more than about Six time[s], as it is a catch-all rule that all it takes [is?] an Officer to allege the Plaintiff, or any inmate said something or presented himself in a certain manner and there is no way the Plaintiff can defend himself, and when he can show it was written against him for retaliation, the Hearing Officer will take the side of the Reporting Officer or Staff under contract with the (DOC).

(*Id.* at 89.)

The facts alleged in the Complaint demonstrate that the plaintiff told defendant Cook that he had destroyed the personal documents he had obtained about her and other staff members at MOCC, when, in fact, he was still in possession of such documents.  Thus, the plaintiff misinformed defendant Cook, which is squarely covered by the plain language of this regulation, and the plaintiff cannot establish that an inmate of normal intelligence could not reasonably determine that such conduct would violate

the regulation.  Thus, the undersigned proposes that the presiding District Judge **FIND** that the "Fraudulent Representation" regulation is not unconstitutionally vague or ambiguous, and that the plaintiff's Complaint fails to state a claim upon which relief can be granted in regard to this regulation.

Pursuant to these findings, the plaintiff's request for an Order ruling that each named section of Policy Directive 325.00 is unconstitutional and ordering the removal of such sections should be denied.  Furthermore, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Complaint fails to state any claim upon which relief can be granted against defendant Rubenstein and that these proposed claims should be dismissed pursuant to *Twombly* and *Iqbal*.

### G.    The plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

On April 18, 2012, the plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 7), in which he requested that the court restrain Mount Olive Correctional Complex (MOCC) or the Division of Corrections (DOC) from destroying any of the documents and records concerning the plaintiff that are on file or in the possession of these agencies, including, *inter alia*, incident reports, disciplinary hearing tapes, grievance documents and appeals, and any other physical evidence concerning the plaintiff.  The plaintiff's motion indicates that the DOC's policies and procedures call for the destruction of any evidence such as disciplinary hearing tape recordings, administrative segregation hearing tape recordings, or other electronic media, after two years.  (*Id.* at 1.)

The plaintiff's motion indicates that his first disciplinary hearing that is the subject of this Complaint was held on March 3, 2010, and then describes other hearings

that occurred thereafter.  The plaintiff requests that the court enter an Order to prevent the defendants or their agents from destroying these recordings and document made between February 15, 2010 and June 30, 2010.  (*Id.* at 2.)

After receipt of the plaintiff's motion, the undersigned's staff contacted Charles Houdyschell, Assistant Attorney General for the Division of Corrections, and requested that a litigation hold be placed on any documents or other evidence and records concerning the plaintiff.  Mr. Houdyschell confirmed that he would request the litigation hold, but the undersigned has not confirmed whether the evidence concerning the requested time period has been maintained.

## RECOMMENDATION

Based upon the proposed findings contained herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DISMISS** the plaintiff's Complaint, in its entirety, pursuant to 28 U.S.C.§ 1915A and the holdings in *Twombly* and *Iqbal,* and that the plaintiff's Application to Proceed Without Prepayment of Fees and Costs (ECF No. 1) be **DENIED**.  In light of the proposed recommendation for the dismissal of the entirety of the plaintiff's Complaint, it is further respectfully **RECOMMENDED** that the plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 7) be **DENIED**.

The plaintiff is notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the plaintiff shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the

Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to the plaintiff.

May 17, 2012

Mary E. Stanley
United States Magistrate Judge